UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION
____

PATRICK HARMON,

          Plaintiff,                        Case No. 2:22-cv-111

v.                                              Honorable Jane M. Beckering

UNKNOWN KENT et al.,

          Defendants.
_____/

## OPINION

This is a civil rights action brought by a state prisoner under 42 U.S.C. § 1983. Under the Prison Litigation Reform Act, Pub. L. No. 104-134, 110 Stat. 1321 (1996) (PLRA), the Court is required to dismiss any prisoner action brought under federal law if the complaint is frivolous, malicious, fails to state a claim upon which relief can be granted, or seeks monetary relief from a defendant immune from such relief. 28 U.S.C. § 1915A; 42 U.S.C. § 1997e(c). The Court must read Plaintiff's *pro se* complaint indulgently, *see Haines v. Kerner*, 404 U.S. 519, 520 (1972), and accept Plaintiff's allegations as true, unless they are clearly irrational or wholly incredible. *Denton v. Hernandez*, 504 U.S. 25, 33 (1992). Applying these standards, the Court will dismiss Plaintiff's complaint for failure to state a claim.

## Discussion

### I.    Factual allegations

Plaintiff is presently incarcerated with the Michigan Department of Corrections (MDOC) at the Marquette Branch Prison (MBP) in Marquette, Marquette County, Michigan. The events

about which he complains occurred at that facility. Plaintiff sues the following MBP officials: Correctional Officer Unknown Kent and Warden Erica Huss. (Compl., ECF No. 1, PageID.1.)

In Plaintiff's complaint, he claims that he was incarcerated under conditions that put him at risk of contracting COVID-19. (*See generally id.*) Plaintiff states that "[t]o minimize . . . exposure [to COVID-19,] the Director's Office Memorandum . . . [(DOM)] established that[] [a]ll individuals shall be screened for potential signs of Covid-19 before entering a correctional facility or office building." (*Id.*, PageID.2.) Specifically, Plaintiff indicates that DOM 2020-30R5 provided that "[a]ny individual who shows symptoms of Covid-19 shall be denied entry," and that "employees who are feeling sick with any illness must stay home." (*Id.* (citing DOM 2020-30R5).) Plaintiff contends that the DOMs also called for isolation areas for prisoners, and that "[a] prisoner who tests positive for Covid-19 shall be placed in quarantine in a designated isolation area as soon as resources permit regardless of their security level or prior criminal history." (*Id.*) Plaintiff indicates that as of October 11, 2020, C-Unit and Q-Unit were the designated isolations areas at MBP. (*Id.*)

Plaintiff alleges that on January 9, 2022, Defendant Kent and Correctional Officer Anderson (not a party) "[f]ailed to or refused to be screened for the coronavirus[] before entering [MBP]." (*Id.*) Plaintiff states that Defendant Kent worked on G-Unit during second shift from 2:00 p.m. to 10:00 p.m. on that date. (*Id.*) During this shift, Defendant Kent "passed out food" to Plaintiff, "performed a shake down" of Plaintiff, and performed scheduled "rounds on the second gallery where Plaintiff was housed." (*Id.*) Plaintiff contends that "because [he] is housed in an open bar setting, Defendant Kent came within inches of Plaintiff." (*Id.*)

At some point on January 9, 2022, "Plaintiff saw Defendant Kent coughing, and asked, '[Correctional Officer] are you sick[;] [y]ou don't look well." (*Id.*, PageID.2–3.) Defendant Kent

2

replied that he was "fine" and told Plaintiff to "take [his] bread for dinner." (*Id.*, PageID.3.) Plaintiff then stated, "[m]aybe you should leave and get tested," and Defendant Kent replied that the facility was "short staff," so he had to be there; "plus we will all catch it anyway." (*Id.*) Plaintiff asked if Defendant Kent was "tested before coming to work," and Defendant Kent replied that he would "test after [his] shift." (*Id.*) Plaintiff alleges that after Defendant Kent worked his eight-hour shift on G-Unit, Defendant Kent "was tested leaving the facility, which confirmed he was in fact positive with the Covid-19 virus." (*Id.*)

Plaintiff contends that "[w]hen this news hit the compound of the two [correctional officers] having Covid[,] [t]he facility entered into a facility wide testing the next day on January 10, 2022." (*Id.*) Plaintiff alleges that "[a]s the new variant spread[] faster, numerous inmates who tested[] were confirmed positive including this Plaintiff." (*Id.*) At some point on January 10, 2022, Plaintiff contends that he spoke with Defendant Huss. (*Id.*) Defendant Huss told Plaintiff, "[w]e are implementing those policies when and where." (*Id.*) When Plaintiff replied, "[m]ean[]while, I'm left here with no defense against staff not testing and your officers not submitting to these test[s] . . .", Defendant Huss stated, "[y]ou are overracting [sic] Mr. Harmon[;] [t]his new strain is not that serious." (*Id.*) Plaintiff stated, "[y]ou see that is the problem, no one takes this serious until the virus attacks them." (*Id.*) Defendant Huss responded that the facility was "short staff[;] besides we will all catch this thing anyway." (*Id.*) When Plaintiff replied, "[s]omething like only the strong survive right," Defendant Huss stated, "[s]ee there you go again overracting [sic]." (*Id.*)

Plaintiff alleges that Defendants Kent and Huss "knew about the Covid-19 virus before the [o]utbreak at MBP in January of 2022." (*Id.*, PageID.4.) Plaintiff contends that Defendants Kent and Huss have failed to follow the current health and safety protocols mandated by DOM 2020-30R5 and related Executive Orders. (*Id.*, PageID.3–4.) Plaintiff also alleges that Defendants

3

Kent and Huss "failed to ensure that correctional officers were screened before entering the MBP facility." (*Id.*, PageID.4.) Additionally, Plaintiff contends that Defendant Huss "knowingly allowed correctional officers Kent and Anderson and others to enter the MBP facility to compensate for staff shortage caused by the Covid-19 pandemic without screening for Covid." (*Id.*) Plaintiff also contends that Defendants Kent and Huss "knew or should have known that staff testing was required before entering the MBP's facility." (*Id.*)

Further, "Plaintiff claims that because [he is] asthmatic, [he is] medically-vulnerable." (*Id.*) Plaintiff alleges that "due to the actions or inactions of [Defendants Kent and Huss,] Plaintiff has suffered chest pain, shortness of breath, severe headaches, and difficulty in breathing when speaking," and "suffered from days of diarrhea." (*Id.*)

Based on the foregoing allegations, Plaintiff avers that Defendants Kent and Huss violated his rights under the Eighth Amendment. As relief, Plaintiff seeks compensatory and punitive damages, as well as his "costs in this suit." (*Id.*, PageID.4–5.)

## II.     Failure to state a claim

A complaint may be dismissed for failure to state a claim if it fails "to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). While a complaint need not contain detailed factual allegations, a plaintiff's allegations must include more than labels and conclusions. *Id.*; *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). The court must determine whether the complaint contains "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 679. Although the plausibility

4

standard is not equivalent to a "'probability requirement,' . . . it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* at 678 (quoting *Twombly*, 550 U.S. at 556). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—that the pleader is entitled to relief." *Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2)); *see also Hill v. Lappin*, 630 F.3d 468, 470–71 (6th Cir. 2010) (holding that the *Twombly/Iqbal* plausibility standard applies to dismissals of prisoner cases on initial review under 28 U.S.C. §§ 1915A(b)(1) and 1915(e)(2)(B)(ii)).

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege the violation of a right secured by the federal Constitution or laws and must show that the deprivation was committed by a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988); *Street v. Corr. Corp. of Am.*, 102 F.3d 810, 814 (6th Cir. 1996). Because § 1983 is a method for vindicating federal rights, not a source of substantive rights itself, the first step in an action under § 1983 is to identify the specific constitutional right allegedly infringed. *Albright v. Oliver*, 510 U.S. 266, 271 (1994). In this action, Plaintiff contends that Defendants Kent and Huss violated his Eighth Amendment rights.

The Eighth Amendment imposes a constitutional limitation on the power of the states to punish those convicted of crimes. Punishment may not be "barbarous" nor may it contravene society's "evolving standards of decency." *Rhodes v. Chapman*, 452 U.S. 337, 345–46 (1981). The Eighth Amendment, therefore, prohibits conduct by prison officials that involves the "unnecessary and wanton infliction of pain." *Ivey v. Wilson*, 832 F.2d 950, 954 (6th Cir. 1987) (per curiam) (quoting *Rhodes*, 452 U.S. at 346). The deprivation alleged must result in the denial of the "minimal civilized measure of life's necessities." *Rhodes*, 452 U.S. at 347; *see also Wilson v. Yaklich*, 148 F.3d 596, 600–01 (6th Cir. 1998). The Eighth Amendment is only concerned with

"deprivations of essential food, medical care, or sanitation" or "other conditions intolerable for prison confinement." *Rhodes*, 452 U.S. at 348 (citation omitted). Moreover, "[n]ot every unpleasant experience a prisoner might endure while incarcerated constitutes cruel and unusual punishment within the meaning of the Eighth Amendment." *Ivey*, 832 F.2d at 954.

In order for a prisoner to prevail on an Eighth Amendment claim, the prisoner must show that he faced a sufficiently serious risk to his health or safety and that Defendants acted with "'deliberate indifference' to inmate health or safety." *Mingus v. Butler*, 591 F.3d 474, 479–80 (6th Cir. 2010) (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)) (applying deliberate indifference standard to medical claims); *see also Helling v. McKinney*, 509 U.S. 25, 35 (1993) (applying deliberate indifference standard to conditions of confinement claims). The deliberate-indifference standard includes both objective and subjective components. *Farmer*, 511 U.S. at 834; *Helling*, 509 U.S. at 35–37. To satisfy the objective prong, an inmate must show "that he is incarcerated under conditions posing a substantial risk of serious harm." *Farmer*, 511 U.S. at 834. Under the subjective prong, an official must "know[] of and disregard[] an excessive risk to inmate health or safety." *Id.* at 837. "[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Id.* at 844.

### A. Objective Prong

In this action, Plaintiff contends that that he was incarcerated under conditions that put him at risk of contracting COVID-19. (*See generally* Compl., ECF No. 1.)

In a 2020 case brought by federal prisoners under 28 U.S.C. § 2241, the United States Court of Appeals for the Sixth Circuit addressed the issue of whether the Bureau of Prisons (BOP) violated the Eighth Amendment rights of medically vulnerable inmates at the Elkton Federal Correctional Institution by failing to adequately protect them from COVID-19 infection. *Wilson v.*

6

*Williams*, 961 F.3d 829 (6th Cir. 2020). In the opinion, the Sixth Circuit found that the plaintiffs in *Wilson* had easily satisfied the objective component of an Eighth Amendment claim:

> The COVID-19 virus creates a substantial risk of serious harm leading to pneumonia, respiratory failure, or death. The BOP acknowledges that "[t]he health risks posed by COVID-19 are significant." CA6 R. 35, Appellant Br., PageID 42. The infection and fatality rates at Elkton have borne out the serious risk of COVID-19, despite the BOP's efforts. The transmissibility of the COVID-19 virus in conjunction with Elkton's dormitory-style housing—which places inmates within feet of each other—and the medically-vulnerable subclass's health risks, presents a substantial risk that petitioners at Elkton will be infected with COVID-19 and have serious health effects as a result, including, and up to, death. Petitioners have put forth sufficient evidence that they are "incarcerated under conditions posing a substantial risk of serious harm." *Farmer*, 511 U.S. at 834.

*Id.* at 840.

Under that precedent, a medically vulnerable plaintiff may satisfy the objective prong by alleging conditions that could facilitate COVID-19 transmission within a prison and the health risks posed by the virus. Plaintiff alleges conditions that could facilitate COVID-19 transmission within his prison, and Plaintiff states that he suffers from at least one condition that might make him medically vulnerable: asthma. (Compl., ECF No. 1, PageID.4.) Therefore, at this early stage of the proceedings, the Court concludes that Plaintiff has alleged facts sufficient to satisfy the objective prong of the deliberate indifference test.

### B. Subjective Prong

Notwithstanding Plaintiff's ability to satisfy the objective prong, he fails to allege facts sufficient to satisfy the subjective prong of the deliberate indifference test. The Sixth Circuit went on in *Wilson* to address the subjective prong of an Eighth Amendment claim, noting that the pertinent question was whether the BOP's actions demonstrated deliberate indifference to the serious risk of harm posed by COVID-19 in the prison.

> There is no question that the BOP was aware of and understood the potential risk of serious harm to inmates at Elkton through exposure to the COVID-19 virus. As of April 22, fifty-nine inmates and forty-six staff members tested positive for

COVID-19, and six inmates had died. "We may infer the existence of this subjective state of mind from the fact that the risk of harm is obvious." *Hope v. Pelzer*, 536 U.S. 730, 738 (2002). The BOP acknowledged the risk from COVID-19 and implemented a six-phase plan to mitigate the risk of COVID-19 spreading at Elkton.

The key inquiry is whether the BOP "responded reasonably to th[is] risk." *Farmer*, 511 U.S. at 844. The BOP contends that it has acted "assiduously to protect inmates from the risks of COVID-19, to the extent possible." CA6 R. 35, Appellant Br., PageID 42. These actions include

> implement[ing] measures to screen inmates for the virus; isolat[ing] and quarantin[ing] inmates who may have contracted the virus; limit[ing] inmates' movement from their residential areas and otherwise limit[ing] group gatherings; conduct[ing] testing in accordance with CDC guidance; limit[ing] staff and visitors and subject[ing] them to enhanced screening; clean[ing] common areas and giv[ing] inmates disinfectant to clean their cells; provid[ing] inmates continuous access to sinks, water, and soap; educat[ing] staff and inmates about ways to avoid contracting and transmitting the virus; and provid[ing] masks to inmates and various other personal protective equipment to staff.

*Id.* at 42–43.

The BOP argues that these actions show it has responded reasonably to the risk posed by COVID-19 and that the conditions at Elkton cannot be found to violate the Eighth Amendment. We agree.

Here, while the harm imposed by COVID-19 on inmates at Elkton "ultimately [is] not averted," the BOP has "responded reasonably to the risk" and therefore has not been deliberately indifferent to the inmates' Eighth Amendment rights. *Farmer*, 511 U.S. at 844. The BOP implemented a six-phase action plan to reduce the risk of COVID-19 spread at Elkton. Before the district court granted the preliminary injunction at issue, the BOP took preventative measures, including screening for symptoms, educating staff and inmates about COVID-19, cancelling visitation, quarantining new inmates, implementing regular cleaning, providing disinfectant supplies, and providing masks. The BOP initially struggled to scale up its testing capacity just before the district court issued the preliminary injunction, but even there the BOP represented that it was on the cusp of expanding testing. The BOP's efforts to expand testing demonstrate the opposite of a disregard of a serious health risk.

*Wilson*, 961 F.3d at 840–41.

In its decision, the Sixth Circuit recognized that other Sixth Circuit decisions have found similar responses by prison officials and medical personnel, such as quarantining infected inmates

8

and distributing information about a disease in an effort to prevent spread to be reasonable. *Id.* at 841 (citing *Wooler v. Hickman Cnty.*, 377 F. App'x 502, 506 (6th Cir. 2010); *Rouster v. Cnty. of Saginaw*, 749 F.3d 437, 448–49 (6th Cir. 2014); *Harrison v. Ash*, 539 F.3d 510, 519–20 (6th Cir. 2008); *Rhinehart v. Scutt*, 894 F.3d 721, 740 (6th Cir. 2018)). The *Wilson* Court also noted that other circuits had concluded that similar actions by prison officials demonstrated a reasonable response to the risk posed by COVID-19:

> In *Swain* [*v. Junior*], the Eleventh Circuit granted a stay of a preliminary injunction pending appeal on state inmates' Eighth Amendment claims. 958 F.3d [1081,] 1085 [(11th Cir. 2020) (per curiam)]. The Eleventh Circuit held that "the inability to take a positive action likely does not constitute 'a state of mind more blameworthy than negligence,'" and "the evidence supports that [Metro West Detention Center ("MWDC") is] taking the risk of COVID-19 seriously." *Id.* at 1088–90 (citation omitted). In response to the pandemic in early March, MWDC began "cancelling inmate visitation; screening arrestees, inmates, and staff; and advising staff of use of protective equipment and sanitation practices" and, after reviewing further CDC guidance, began "daily temperature screenings of all persons entering Metro West, establish[ed] a 'COVID-19 Incident Command Center and Response Line' to track testing and identify close contacts with the virus, develop[ed] a social hygiene campaign, and mandate[d] that staff and inmates wear protective masks at all times." *Id.* at 1085–86. The Eleventh Circuit held that, because MWDC "adopted extensive safety measures such as increasing screening, providing protective equipment, adopting [physical] distancing when possible, quarantining symptomatic inmates, and enhancing cleaning procedures," MWDC's actions likely did not amount to deliberate indifference. *Id.* at 1090.
>
> Similarly, the Fifth Circuit granted stays of two preliminary injunctions in *Valentine* [*v. Collier,* 956 F.3d 797 (5th Cir. 2020) (per curiam),] and *Marlowe* [*v. LeBlanc*, No. 20-30276, 2020 WL 2043425 (5th Cir. Apr. 27, 2020) (per curiam)]. In *Valentine*, inmates at Texas's Wallace Pack Unit filed a class action suit against the Texas Department of Criminal Justice ("TDCJ") alleging violations of the Eighth Amendment. 956 F.3d at 799. In response to the COVID-19 pandemic, TDCJ had taken preventative measures such as providing "access to soap, tissues, gloves, [and] masks," implementing "regular cleaning," "quarantin[ing] of new prisoners," and ensuring "[physical] distancing during transport." *Id.* at 802. The Fifth Circuit determined that the district court applied the wrong legal standard by "collaps[ing] the objective and subjective components of the Eighth Amendment inquiry" by "treating inadequate measures as dispositive of the Defendants' mental state" under the subjective prong and held that "accounting for the protective measures TDCJ has taken" the plaintiffs had not shown deliberate indifference. *Id.* at 802–03. In *Marlowe*, the Fifth Circuit relied on its reasoning in *Valentine* and again reiterated that there was "little basis for concluding that [the correctional

9

> center's] mitigation efforts," which included "providing prisoners with disinfectant spray and two cloth masks[,] . . . limiting the number of prisoners in the infirmary lobby[,] and painting markers on walkways to promote [physical] distancing," were insufficient. 2020 WL 2043425, at *2–3.

*Id.* at 841–42.

After reviewing the cases, the *Wilson* Court held that even if the BOP's response to COVID-19 was inadequate, it took many affirmative actions, not only to treat and quarantine inmates who had tested positive, but also to prevent widespread transmission of COVID-19. The Court held that because the BOP had neither disregarded a known risk nor failed to take steps to address the risk, it did not act with deliberate indifference in violation of the Eighth Amendment. *Id.* at 843–44.

In addition, in *Cameron v. Bouchard,* 818 F. App'x 393 (6th Cir. 2020), the Court relied on *Wilson* to find that pretrial detainees in the Oakland County Jail were unlikely to succeed on the merits of their Eighth and Fourteenth Amendment claims. The plaintiffs in *Cameron* claimed that jail officials were deliberately indifferent to the substantial risk of harm posed by COVID-19 at the jail. The district court initially granted a preliminary injunction requiring the defendants to "(1) provide all [j]ail inmates with access to certain protective measures and medical care intended to limit exposure, limit transmission, and/or treat COVID-19, and (2) provide the district court and Plaintiffs' counsel with a list of medically vulnerable inmates within three business days." *Id.* at 394. However, following the decision in *Wilson*, the Court granted the defendants' renewed emergency motion to stay the preliminary injunction, finding that the preventative measures taken by the defendants were similar to those taken by officials in *Wilson* and, thus, were a reasonable response to the threat posed by COVID-19 to the plaintiffs. *Id.* at 395. Subsequently, in an unpublished opinion issued on July 9, 2020, the Sixth Circuit vacated the injunction. *Cameron v. Bouchard*, 815 F. App'x 978 (6th Cir. 2020).

More recently, the Sixth Circuit affirmed this Court's dismissal of a claim similar to Plaintiff's:

> Dykes-Bey alleges that the defendants were deliberately indifferent to the serious risk of harm posed by COVID-19. A deliberate-indifference claim under the Eighth Amendment includes both an objective and a subjective prong: (1) the inmate "is incarcerated under conditions posing a substantial risk of serious harm," and (2) "the official knows of and disregards an excessive risk to inmate health or safety." *Farmer v. Brennan*, 511 U.S. 825, 834, 837 (1994).
>
> As we recognized in *Wilson v. Williams*, 961 F.3d 829, 840 (6th Cir. 2020), "the objective prong is easily satisfied" in this context. "The COVID-19 virus creates a substantial risk of serious harm leading to pneumonia, respiratory failure, or death." *Id*. "The transmissibility of the COVID-19 virus in conjunction with [a prison's] dormitory-style housing—which places inmates within feet of each other—and [an inmate's] health risks, presents a substantial risk that [an inmate] will be infected with COVID-19 and have serious health effects as a result, including, and up to, death." *Id*. The objective prong is met here.
>
> The subjective prong, on the other hand, generally requires alleging at least that the defendant "acted or failed to act despite his knowledge of a substantial risk of serious harm." *Id*. (quoting *Farmer*, 511 U.S. at 842). "The official must have a subjective 'state of mind more blameworthy than negligence,' akin to criminal recklessness." *Cameron v. Bouchard*, 815 F. App'x 978, 984 (6th Cir. 2020) (quoting *Farmer*, 511 U.S. at 835). As relevant here, "[t]he key inquiry is whether the [defendants] 'responded reasonably to the risk' . . . posed by COVID-19." *Wilson*, 961 F.3d at 840–41 (quoting *Farmer*, 511 U.S. at 844) (alterations added and omitted). And a response may be reasonable even if "the harm imposed by COVID-19 on inmates . . . 'ultimately [is] not averted.'" *Id*. at 841 (quoting *Farmer*, 511 U.S. at 844).
>
> Dykes-Bey fails to satisfy the subjective prong. He alleges that the defendants, knowing of the harm posed by COVID-19, acted with deliberate indifference by not providing KCF's inmates with the necessary means to practice social distancing. But Dykes-Bey's complaint does not allege any facts indicating that the defendants were deliberately indifferent to him or any other plaintiff. The complaint does not allege, for example, that KCF had enough physical space to implement social distancing, and that the defendants deliberately chose not to use that space. *Cf. Cameron*, 815 F. App'x at 986 (concluding that the plaintiffs failed to produce evidence showing that the defendants let empty prison cells go unused). Nor does it allege that the defendants knowingly housed COVID-19-positive inmates alongside any plaintiff, or even that a COVID-19 outbreak occurred in KCF. Dykes-Bey's allegations about the lack of social distancing, therefore, do not establish deliberate indifference.

> Moreover, Dykes-Bey's focus on social distancing ignores the "key inquiry" in these cases—whether the defendants "'responded reasonably to the risk' . . . posed by COVID-19." *Wilson*, 961 F.3d at 840–41 (citation omitted). To that end, Dykes-Bey's own allegations establish that the defendants acted reasonably. The complaint recognizes, for example, that the defendants screened employees daily for COVID-19 symptoms, provided masks to inmates, required correctional officers to wear masks (although some unnamed officers allegedly did not wear them properly), and provided bleach-based disinfectant in every communal bathroom. In other words, Dykes-Bey's complaint acknowledges that the defendants took affirmative steps to mitigate COVID-19's risks. Although he argues that those steps would ultimately be insufficient to stop an outbreak, whether these steps were sufficient matters less than what they say about the defendants' states of mind. *Id*. at 841 (noting that defendants may have responded reasonably even if the "harm imposed by COVID-19 on inmates . . . 'ultimately [is] not averted'" (quoting *Farmer,* 551 U.S. at 844)). That is, what matters is whether the precautionary steps taken show that the defendants responded reasonably to the risks of COVID-19. Here, as in *Wilson*, they do. *See, e.g.*, *id.* at 840–41 (finding that similar measures amounted to a reasonable response). In short, these allegations defeat the subjective prong and thus his deliberate indifference claim.
>
> The district court concluded that the defendants were not deliberately indifferent, but it relied on materials outside the record—official sanitation and hygiene policies adopted by the MDOC, reports of confirmed COVID-19 cases at KCF, and an MDOC press release—to reach this conclusion. *See* R. 36, Page ID# 281. Even if its consideration of those materials was improper, we may affirm on any basis supported by the record. *See Angel v. Kentucky*, 314 F.3d 262, 264 (6th Cir. 2002). As stated, Dykes-Bey's own allegations suffice to show that the defendants did not disregard the risks of COVID-19. Therefore, we affirm the district court's judgment on those grounds.

*Dykes-Bey v. Washington*, No. 21-1260, 2021 WL 7540173, at *2–3 (6th Cir. Oct. 14, 2021) (footnote omitted).

Here, Plaintiff alleges that he was incarcerated under conditions that put him at risk of contracting COVID-19. Reading Plaintiff's complaint with all due liberality, *see Haines*, 404 U.S. at 520, he contends that Defendants Kent and Huss failed generally to prevent an outbreak of COVID-19 at MBP because they "knew or should have known that staff testing was required before entering the MBP's facility," "failed to ensure that correctional officers were screened before entering the MBP facility," and "disregarded both Executive Orders[] and DOM[s] by failing to follow and[/]or to implement the current health and safety protocols." (Compl., ECF

12

No. 1, PageID.4.) Plaintiff also contends that Defendant Huss "knowingly allowed correctional officers Kent and Anderson and others to enter the MBP facility to compensate for staff shortage caused by the Covid-19 pandemic without screening for Covid." (*Id.*) Further, Plaintiff presumably complains more specifically that his interactions with Defendant Kent during Defendant's shift on January 9, 2022, violated his Eighth Amendment rights. The Court addresses these claims below.

As an initial matter, Plaintiff's own allegations describe steps that Defendants took in response to the COVID-19 pandemic and the outbreak at MBP. Based on Plaintiff's diagnosis and his assertion that there was "facility wide testing" on January 10, 2022, and that "numerous inmates who tested[] were confirmed positive [for COVID-19]," Defendants clearly provided COVID-19 testing for prisoners. (*Id.*, PageID.3.) Further, although Plaintiff believes that Defendant Kent was not properly screened when he entered the facility for his shift on January 9, 2022, because, according to Plaintiff, staff screening apparently should have included "staff testing" before entering the facility, Plaintiff's allegations show that there was in fact COVID-19 testing for correctional officers at MBP. (*See id.* (stating that "Defendant Kent was tested leaving the facility").) It is clear that Plaintiff believes that all MBP staff should have been tested *before* entering the facility; however, as Plaintiff states in his complaint, the relevant DOM "established that[] [a]ll individuals shall be *screened* for potential signs of Covid-19 before entering a correctional facility or office building," not that they shall be *tested*. (*Id.*, PageID.2 (emphasis added) (citing DOM 2020-30R5).)

Additionally, Plaintiff conjectures that Defendant Kent and Correctional Officer Anderson, who is not a party, "[f]ailed to or refused to be screened for the coronavirus[] before entering [MBP]" on January 9, 2022, (*id.*), and that Defendant Huss "knowingly allowed correctional officers Kent and Anderson and others to enter the MBP facility to compensate for staff shortage

13

caused by the Covid-19 pandemic without screening for Covid." (*Id.*, PageID.4.) However, Plaintiff fails to allege any *facts* to suggest that his assertions are anything other than conjecture on his part. (*Id.*) Specifically, Plaintiff does not allege any facts suggesting that he had any knowledge, either firsthand, secondhand, or even thirdhand, of how Defendant Kent or any other correctional officers were, or were not, screened upon entering MBP. Moreover, with respect to Defendant Huss, besides Plaintiff's conclusory assertion that Defendant Huss "knowingly allowed correctional officers," such as Kent and Anderson, to enter the facility "to compensate for staff shortage," (*id.*), Plaintiff fails to allege any facts or to provide any explanation as to how Defendant Huss knew that Defendant Kent, Correctional Officer Anderson, or any other correctional officers were COVID-19-positive, but allowed them to enter the facility anyway. Indeed, Plaintiff's own allegations appear to belie his assertion regarding Defendant Huss's alleged knowledge of COVID-19-positive correctional officers entering MBP because Plaintiff believes that correctional officers were not tested for COVID-19 before entering the facility. And, Plaintiff fails to allege any *facts* suggesting that Defendant Huss knew that individual officers had COVID-19 but entered the facility anyway. Relatedly, although Plaintiff alleges that Defendant Kent was coughing at some point when Plaintiff saw him during his shift, (*id.*, PageID.2–3), Plaintiff does not allege that Defendant Kent knew that he was positive for COVID-19 during his shift. Additionally, nothing in the complaint suggests that Defendant Kent believed that he had any illness on January 9, 2022. Indeed, Plaintiff states that after Plaintiff told Defendant Kent that he "[did not] look well," Defendant Kent advised Plaintiff that he was "fine." (*Id.*, PageID.3.)

Furthermore, as to Plaintiff's COVID-19 diagnosis, although Plaintiff believes that he "contracted the Covid-19 virus" "as a direct consequence of the actions of Defendant Kent" on January 9, 2022, Plaintiff's allegations in his complaint regarding his diagnosis are scarce. (*Id.*,

14

PageID.4.) As an initial matter, Plaintiff does not allege that he lacked a mask or other personal protective equipment during his interaction with Defendant Kent on January 9, 2022. (*See id.*) With respect to the specific timing of Plaintiff's diagnosis, Plaintiff provides more details about the timing of his COVID-19 diagnosis in a grievance that Plaintiff submitted regarding the issue, which he attached to his complaint. (ECF No. 1-1.) Specifically, Plaintiff states: "On 1-10-2022, I found o[ut] that a Covid-19 test that I took came back positive." (*Id.*, PageID.10.) From Plaintiff's complaint and the attached grievance, it is unclear on what date Plaintiff took the COVID-19 test that resulted in his positive test, and it is unclear what type of test was used (i.e., whether it was a rapid test or a test that required lab processing). Further, Plaintiff provides no allegations suggesting that his exposure to Defendant Kent on January 9, 2022, was Plaintiff's sole exposure to COVID-19 in the dates leading to his COVID-19-positive diagnosis on January 10, 2022. Plaintiff's allegation that "numerous inmates" tested positive for COVID-19 following the facility-wide testing on January 10, 2022, suggests that COVID-19 was already in the facility before Defendant Kent's shift on January 9, 2022, because Plaintiff does not allege that Defendant Kent went to all areas of MBP during his shift. (*See* Compl., ECF No. 1, PageID.4.) Instead, Plaintiff alleges only that Defendant Kent worked on a single unit on January 9, 2022—G-Unit. (*See id.*)

Finally, with respect to Plaintiff's vague assertion that Defendants Kent and Huss "disregarded both Executive Orders[] and DOM[s] by failing to follow and[/]or to implement the current health and safety protocols," (*id.*) besides Plaintiff's allegations regarding the screening procedures for correctional officers entering MBP—which are addressed above—Plaintiff does not allege any facts to suggest that Defendants failed to follow any other "protocols" that were set forth in the relevant DOMs and Executive Orders. (*See generally id.*)

Although it is clear that Plaintiff believes that Defendants Kent's and Huss's actions on January 9, 2022, resulted in Plaintiff's COVID-19-positive diagnosis on January 10, 2022, the factual allegations in Plaintiff's complaint are simply too scarce to show deliberate indifference. In short, Plaintiff appears to ask the Court to fabricate plausibility to his claims from mere ambiguity. But ambiguity does not support a claim, factual allegations do. The Court is sympathetic to the challenges that Plaintiff and other prisoners have faced while incarcerated during the COVID-19 pandemic. However, Plaintiff must plead enough factual content to permit the Court to draw a reasonable inference that Defendants Kent and Huss were deliberately indifferent to the risk of COVID-19 transmission and, therefore, violated the Eighth Amendment. *See Iqbal*, 556 U.S. at 679. Plaintiff has not done so here. Therefore the Court must dismiss Plaintiff's Eighth Amendment claims against Defendants Kent and Huss.

## Conclusion

Having conducted the review required by the Prison Litigation Reform Act, the Court determines that Plaintiff's complaint will be dismissed for failure to state a claim under 28 U.S.C. § 1915A(b) and 42 U.S.C. § 1997e(c). The Court must next decide whether an appeal of this action would be in good faith within the meaning of 28 U.S.C. § 1915(a)(3). *See McGore v. Wrigglesworth*, 114 F.3d 601, 611 (6th Cir. 1997). Although the Court concludes that Plaintiff's claims are properly dismissed, the Court does not conclude that any issue Plaintiff might raise on appeal would be frivolous. *Coppedge v. United States*, 369 U.S. 438, 445 (1962). Accordingly, the Court does not certify that an appeal would not be taken in good faith. Should Plaintiff appeal this decision, the Court will assess the $505.00 appellate filing fee pursuant to § 1915(b)(1), *see McGore*, 114 F.3d at 610–11, unless Plaintiff is barred from proceeding *in forma pauperis*, *e.g.*,

by the "three-strikes" rule of § 1915(g). If he is barred, he will be required to pay the $505.00 appellate filing fee in one lump sum.

This is a dismissal as described by 28 U.S.C. § 1915(g).

A judgment consistent with this opinion will be entered.


Dated:    September 30, 2022                     /s/ Jane M. Beckering
                                                                                      Jane M. Beckering
                                                                                      United States District Judge